UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JASON L. SANDERS et al.,

                Plaintiffs,

v.

MATT MACAULEY et al.,

                Defendants.

_____/

Case No. 1:22-cv-18

Honorable Paul L. Maloney

## **OPINION**

This is a civil rights action brought by 86[1] state prisoners under 42 U.S.C. § 1983. Plaintiffs seek redress from employees of the State government. Therefore, under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to screen the complaint "before docketing, if feasible or, in any event, as soon as practicable after docketing . . . ." 28 U.S.C. § 1915A(a). The Court is obligated to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiffs' *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiffs' allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying the PLRA standard, the Court will dismiss the complaint because it is malicious and because it fails to state a claim. The Court will also deny Plaintiff Sanders' pending motions.

---

[1] A pending motion to file a supplemental complaint seeks to add an 87th plaintiff. (*See* ECF No. 18, PageID.401.)

## Discussion

### I.      Factual allegations

Plaintiffs are presently incarcerated with the Michigan Department of Corrections (MDOC) at the Bellamy Creek Correctional Facility (IBC) in Ionia, Ionia County, Michigan. The events about which they complain occurred at that facility. Plaintiffs sue the following IBC personnel: Warden Matt Macauley; Deputy Warden Unknown Walzach; Assistant Deputy Warden of Housing Brian Hadden; Prisoner Counselors Unknown Lemke and Craig Ritter; Corrections Officer Unknown Stuntman; Healthcare Unit Manager Unknown Part(y)(ies) #1; and Healthcare Unit Supervisor Unknown Part(y)(ies) #2.

Plaintiffs list what they style as 13[2] separate "legal claims" for relief asserting rights provided under the First, Eighth, and Fourteenth Amendments. Each claim relates in some way to IBC's response to the ongoing COVID-19 pandemic. Although this complaint may initially appear to resemble others that have been brought in the Western District of Michigan by prisoners since the start of the pandemic, this complaint is different for at least two reasons.

First, Plaintiffs are not a single prisoner or a small group; they are 86 prisoners. Plaintiff Sanders prepared the complaint "on behalf of himself" and 85 other Plaintiffs who signed the complaint and, purportedly, "are similarly situated."[3] (Compl., ECF No. 1, PageID.1.) Plaintiff Sanders provides a paragraph describing himself in the list of parties. (*Id.*, PageID.4.) All of the other Plaintiffs are described collectively in a single paragraph. (*Id.*) Little is said about these 85

---

[2] The complaint includes two claims identified as "Claim 12." (*See* Compl., ECF No. 1, PageID.10, 12.) For clarity, the claims will be referred to as "Claim 12a" and "Claim 12b" based on the order they appear in the complaint.

[3] Plaintiff Sanders also wrote, "I am filing this formal complaint on behalf of myself and every prisoner in Unit-5 from 12- -2021 [sic] to the present date . . . ." (Compl., ECF No. 1, PageID.2.)

other Plaintiffs who are identified only because they signed the complaint. (*Id.*, PageID.14–17.) The complaint explains merely that each of these 85 other Plaintiffs "is and was at all times mentioned" during the events described a prisoner at IBC on Unit 5. (*Id.*, PageID.4.) Yet, it is not at all clear that even this description is correct.[4] Moreover, the complaint fails to describe with particularity how any of the Plaintiffs other than Plaintiff Sanders has been harmed by any Defendant. The factual allegations that involve any Plaintiff other than Plaintiff Sanders refer only to prisoners generically, e.g., "prisoners," "[p]risoners on B side,"[5] (*id.*, PageID.5, 7), without clarifying which Plaintiffs, if any, were involved. As a result, to the extent the complaint focuses on any prisoner, it focuses on Plaintiff Sanders.

Second, this is not Plaintiff Sanders' first, second, or even third complaint since September 2020 complaining of IBC's response to the COVID-19 pandemic. Indeed, as another judge in this district recently noted,

> [s]ince September 2020, Plaintiff has become a frequent litigant in this Court. During his first 20 years of incarceration, Plaintiff filed only six civil actions in the Western District of Michigan. It does not appear that Plaintiff has filed any civil actions in the Eastern District of Michigan. In less than 18 months since September 2020, Plaintiff has filed 7 actions in this Court.

---

[4] Some of the complaint's earliest factual allegations assert that "[s]everal prisoners in Unit-5 tested positive for COVID-19," and as a result, "[t]hese prisoners were transferred to Housing Unit-8" before they later transferred back to Unit 5. (Compl., ECF No. 1, PageID.5.) The complaint fails to articulate whether any of the 86 Plaintiffs were among those who transferred to Unit 8.

[5] The complaint alternatively refers to "B side" of Unit 5 as "B Wing." For consistency going forward, the Court will refer to that division of Unit 5 as "B Wing."

*Sanders v. Washington*, No. 1:21-cv-1091, 2022 WL 247831, at *5 (W.D. Mich. Jan. 27, 2022). The instant action is Sanders' seventh of the seven.[6] Three of the previous actions complained of IBC's response to the COVID-19 pandemic. *See Sanders I*; *Sanders IV*; *Sanders VI*.

In the instant action, which is Plaintiff Sanders' fourth challenge to IBC's pandemic response, Plaintiffs allege that Defendants Macauley, Healthcare Supervisor Unknown Part(y)(ies) #1, and Healthcare Manager Unknown Part(y)(ies) #2 failed to order COVID-19 testing of IBC staff. (Compl., ECF No. 1, PageID.8.) The complaint contends that, as a result, Defendant Stuntman introduced the novel coronavirus to IBC's Unit 5 when he "came to work" on December 16, 2021, and "pass[ed] out Christmas bags to . . . every 5 Unit prisoner." (*Id.*, PageID.5.) Defendant Stuntman allegedly had COVID-19 at the time, and sometime in the next three days, several Unit 5 prisoners tested positive.

The first set of prisoners who tested positive for COVID-19 were initially moved to Unit 8 before they were moved to the lower level of B Wing on Unit 5. By that time, Unit 5 allegedly had been placed on a COVID-related lockdown. On December 19, 2021, several other prisoners tested positive and "Unit-5's operation was shut down." (*Id.*, PageID.6.) What that purported shutdown encompassed is not altogether clear because the complaint next asserts that "[p]ositive COVID

---

[6] For clarity and brevity, the Court designates these actions as "Sanders" followed by a roman numeral to indicate the order in which they were filed:

> *Sanders v. Washington*, No. 1:20-cv-871, 2020 WL 5757387 (W.D. Mich.) (*Sanders I*);
> *Sanders v. Washington*, No. 1:20-cv-889, 2020 WL 6110787 (W.D. Mich.) (*Sanders II*);
> *Sanders v. Washington*, No. 1:21-cv-54, 2021 WL 1049876 (W.D. Mich.) (*Sanders III*);
> *Sanders v. Washington*, No. 1:21-cv-510, 2022 WL 575179 (W.D. Mich.) (*Sanders IV*) (action related to and with claims severed from *Franklin v. Washington*, No. 1:21-cv-313 (W.D. Mich.));
> *Sanders v. Macauley*, No. 1:21-cv-746, 2021 WL 5997284 (W.D. Mich.) (*Sanders V*);
> *Sanders v. Washington*, No. 1:21-cv-1091, 2022 WL 247831 (W.D. Mich.) (*Sanders VI*);
> *Sanders v. Macauley*, No. 1:22-cv-18 (W.D. Mich.) (*Sanders VII*).

prisoners were all placed on B-lower in the [f]irst 7 or 8 cells . . . ." (*Id.*) The complaint appears to allege that some of the Plaintiffs remained on the lower level of B Wing but had not tested positive for COVID-19 at that point in time. Additionally, the lower level of B Wing was closed off to the rest of Unit 5 and the rest of the prison. Plaintiffs allege that Defendant Stuntman returned to work on the next Monday—presumably December 20, 2021.

Many of the complaint's remaining allegations challenge IBC's handling of the outbreak. Plaintiffs argue that "the showers . . . [we]re not power washed or properly cleaned" after prisoners with COVID-19 used them. (*Id.*) Plaintiffs aver that Unit 5 was not "properly bleached and sanitized" because "only" 2 sanitation workers wiped down surfaces. (*Id.*) Unspecified "[u]nit staff on 1st shift c[ould] be seen without their mask or any PPE" after seeing prisoners with COVID-19. (*Id.*) Defendant Macauley did not require that IBC staff test for COVID-19 after working on Unit 5. Defendants Healthcare Supervisor Unknown Part(y)(ies) #1 and Healthcare Manager Unknown Part(y)(ies) #2 did not conduct rounds on Unit 5 to question the health of those prisoners without COVID-19. During the outbreak on B Wing, prisoners could not enter A Wing to use the "J-Pay and store machines." (*Id.*, PageID.7.) While prisoners continued testing positive on Unit 5, prisoners from the unit were not permitted to go to the building that housed the law library, school, religious services, barbershop, or quartermaster. Prisoners on Unit 5 also had their daily exercise time reduced. Plaintiffs allege that IBC had multiple signs posted on B Wing stating that staff must wear personal protective equipment (PPE), but IBC did not supply prisoners who do not have COVID-19 with the same PPE.

Plaintiffs organize their factual allegations into what they assert are 13 legal claims for relief. Plaintiffs contend in twelve of the claims that the following conduct violated the Eighth Amendment:

> Claim 1: Defendants Macauley, Healthcare Supervisor Unknown Part(y)(ies) #1, and Healthcare Manager Unknown Part(y)(ies) #2 failed to test IBC staff for COVID-19;

> Claim 2: Defendants Macauley, Walzach, Hadden, Healthcare Supervisor Unknown Part(y)(ies) #1, and Healthcare Manager Unknown Part(y)(ies) #2 housed prisoners who had tested positive for COVID-19 on the same unit as those who had not;

> Claim 3: Defendants Macauley, Walzach, Hadden, Healthcare Supervisor Unknown Part(y)(ies) #1, and Healthcare Manager Unknown Part(y)(ies) #2 did not provide porters additional PPE to enter cells of COVID-negative prisoners after using the PPE to enter cells of COVID-positive prisoners;

> Claim 4: Defendant Macauley did not provide prisoners with bleach to clean their cells;

> Claim 5: Defendant Macauley failed to enforce staff PPE requirements on the lower level of B Wing;

> Claim 6: Defendant Macauley permitted COVID-negative prisoners to use the showers after COVID-positive prisoners without "properly sanitiz[ing]";

> Claim 7: Defendant Macauley shortened the time prisoners on Unit 5 could use the exercise yard;

> Claim 8: Defendant Stuntman purportedly had COVID-19 and twice entered Unit 5;

> Claim 9: Defendant Macauley did not provide PPE to COVID-negative prisoners on Unit 5;

> Claim 10: Defendants Healthcare Supervisor Unknown Part(y)(ies) #1 and Healthcare Manager Unknown Part(y)(ies) #2 did not conduct rounds on Unit 5 to question the health of those prisoners without COVID-19;

> Claim 11: Defendant Macauley denied at least some prisoners from Unit 5 the ability to go to the IBC 300 building, which houses the law library, chapel, school, barber, and psychological health services; and

6

> Claim 12b: Defendant Macauley placed COVID-positive prisoners and prisoners who had been in close contact with COVID-positive individuals in the same cells.

(*Id.*, PageID.8–12.)

Plaintiffs further allege that two "claims" assert constitutional violations that extend beyond the Eighth Amendment. In Claim 11, Plaintiffs argue that because Defendant Macauley denied some prisoners the ability to go to the IBC 300 building, he also violated unspecified provisions of the First and Fourteenth Amendments. (*Id.*, PageID.11–12.) In Claim 12a, Plaintiffs contend that Defendants Lemke's and Ritter's failure to process Plaintiffs' court documents violated their rights to access the courts in violation of the First and Fourteenth Amendments. (*Id.*, PageID.10.)

Plaintiffs seek declaratory relief, injunctive relief, compensatory damages, and punitive damages. In their request for declaratory relief, Plaintiffs ask for declaration that Defendants' conduct "violated all the Plaintiffs['] rights under the U.S. Constitution and laws of the United States." (*Id.*, PageID.12.) The request for injunctive relief asks for a Court order directing that Defendant Macauley (1) cease placing any COVID-positive prisoners at IBC, (2) create a housing area at least 100 yards away from the rest of IBC for prisoners who test positive for COVID-19 or other diseases, (3) require that prison staff test for COVID-19 every time before entering the facility, and (4) remove all COVID-positive prisoners from Unit 5. (*Id.*, PageID.12–13.) Plaintiffs ask for $100,000 in compensatory damages for each Plaintiff, and an additional $100,000 in compensatory damages for each Plaintiff who tested positive for COVID-19 after December 15, 2021. (*Id.*, PageID.13.) In their request for punitive damages, Plaintiffs seek "$100,000 *against each* [D]efendant *to each* Plaintiff sim[i]larly situated." (*Id.* (emphasis added).) With 86 Plaintiffs and 8 Defendants, the amount requested in punitive damages totals $68.8 million.

7

## II.     Pending motions

As a preliminary matter, Plaintiff Sanders also has motions pending before the Court. He has filed four motions seeking to file supplemental pleadings (ECF Nos. 9, 14, 15, 18), a motion for preliminary and permanent injunctive relief (ECF No. 3), a motion to appoint counsel (ECF No. 5), and a motion to certify a class (ECF No. 6).

### A.     Motions to supplement the complaint

Plaintiff Sanders has filed four motions seeking to file a succession of supplemental pleadings,[7] each of which he purports to file "on behalf of himself and others sim[i]larly situated." (ECF No. 9, PageID.325; *see also* ECF Nos. 14, 15, 18.)

Rule 11 of the Federal Rules of Civil Procedure requires that "[e]very pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name— or by a party personally if the party is unrepresented." Fed. R. Civ. P. 11(a). In the federal courts, "the parties may plead and conduct *their own cases personally or by counsel*, as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." 28 U.S.C. § 1654 (emphasis added). The statute clearly makes no provision for a *pro se* party to represent others. The federal courts long have held that Section 1654 preserves a party's right to proceed *pro se*, but only with respect to her own claims. Only a licensed attorney may represent other persons. *See Rowland v. Calif. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201–03 (1993);

---

[7] Although Plaintiff Sanders titles the motions differently, all four motions ask the Court for leave to add allegations of conduct that occurred after the filing of the complaint. Therefore, these are properly construed as motions to file supplemental pleadings. *See* Fed. R. Civ. P. 15(d) ("On motion . . . the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented.").

*United States v. 9.19 Acres of Land*, 416 F.2d 1244, 1245 (6th Cir. 1969). Because Plaintiff Sanders

is not a licensed attorney, he is prohibited from filing motions on any other prisoner's behalf. Only

one of the 85 remaining Plaintiffs has signed Plaintiff Sanders' motions, and as result, the motions

to file supplemental pleadings fail to comply with Rule 11. *See Proctor v. Applegate*, 661 F. Supp.

2d 743, 780 (E.D. Mich. 2009) ("Rule 11(a) . . . requires every pleading to be signed by all *pro se*

plaintiffs."). The Court will therefore deny Plaintiff Sanders' motions to file supplemental

complaints.

### B.    Motion for preliminary and permanent injunctive relief

Plaintiff Sanders has filed a motion for "preliminary and permanent injunction[s]"

purportedly "pursuant to Rule 65(b)" and "on behalf of himself and other plaintiffs sim[i]larly

situated."[8] (ECF No. 3, PageID.26.) Although Plaintiff Sanders specifically invokes subsection

(b), which pertains only to temporary restraining orders, he includes nothing addressing the special

requirements of Rule 65(b) to explain why action is needed before Defendants may be heard. That

procedural deficiency, standing alone, is reason enough to deny the motion. Yet, even considering

the motion on the merits, it fails.

Preliminary injunctions are "one of the most drastic tools in the arsenal of judicial

remedies." *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (quoting *Hanson Trust PLC v.

ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986)). The issuance of preliminary

injunctive relief is committed to the discretion of the district court. *See Ne. Ohio Coal. v. Blackwell*,

---

[8] As discussed above, Rule 11 prohibits Plaintiff Sanders from filing a motion on behalf of others
without their signatures. *See* Fed. R. Civ. P. 11(a). The remaining motions discussed herein suffer
from the same defect. Notwithstanding Plaintiffs' failure to comply with Rule 11, the Court has
considered the motions and would deny each motion even if all Plaintiffs had signed it.

467 F.3d 999, 1009 (6th Cir. 2006); *Nader v. Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000). In exercising that discretion, a court must consider whether plaintiff has established the following elements: (1) a strong or substantial likelihood of success on the merits; (2) the likelihood of irreparable injury if the preliminary injunction does not issue; (3) the absence of harm to other parties; and (4) the protection of the public interest by issuance of the injunction. *Nader*, 230 F.3d at 834.

Crucially, the Sixth Circuit has also concluded "that a court must not issue a preliminary injunction where the movant presents no likelihood of merits success." *Daunt v. Benson*, 956 F.3d 396, 421–22 (6th Cir. 2020) (quoting *La.-Pac. Corp. v. James Hardie Bldg. Prod., Inc.*, 928 F.3d 514, 517 (6th Cir. 2019)); *see also Cooey v. Strickland*, 604 F.3d 939, 946 (6th Cir. 2010).

As fully discussed below in Part IV, Plaintiff Sanders presents no likelihood of success on the merits. Accordingly, Plaintiff Sanders' motion for injunctive relief will be denied.

### C.    Motion to appoint counsel

Plaintiff Sanders has also asked the Court to appoint counsel "to represent him and the other Plaintiffs . . . ." (ECF No. 5, PageID.67.) Indigent parties in civil cases have no constitutional right to a court-appointed attorney. *Abdur-Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 492 (6th Cir. 1995); *Lavado v. Keohane*, 992 F.2d 601, 604–05 (6th Cir. 1993). The Court may, however, request an attorney to serve as counsel, in the Court's discretion. *Abdur-Rahman*, 65 F.3d at 492; *Lavado*, 992 F.2d at 604–05; *see Mallard v. U.S. Dist. Ct.*, 490 U.S. 296 (1989).

Appointment of counsel is a privilege that is justified only in exceptional circumstances. In determining whether to exercise its discretion, the Court should consider the complexity of the issues, the procedural posture of the case, and Plaintiffs' apparent ability to prosecute the action without the help of counsel. *See Lavado*, 992 F.2d at 606. The Court has carefully considered these

10

factors and determines that the assistance of counsel does not appear necessary to the proper presentation of Plaintiffs' position. Plaintiff Sanders' motion will be denied.

### D.       Motion to certify a class

Plaintiff Sanders has also filed a motion on behalf of himself and others seeking class certification, which only he has signed. (ECF No. 6.)

The purposes of class action suits are judicial economy and the opportunity to bring claims that would not be brought absent the class action because it might not be economically feasible to bring them as individual claims. *See Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639, 650 (6th Cir. 2006). Federal Rule of Civil Procedure 23, which governs class certification, provides that:

> One or more members of a class may sue . . . as representative parties on behalf of all only if (1) the class is so numerous that joinder . . . is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). The four prerequisites for class certification are respectively referred to as "numerosity, commonality, typicality, and adequacy of representation." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010); *see also Daffin v. Ford Motor Co.*, 458 F.3d 549 (6th Cir. 2006).

Thus, for a case to proceed as a class action, the Court must be satisfied on the grounds enumerated above, including the adequacy of class representation. *See* Fed. R. Civ. P. 23(a)(4). Plaintiff bears the burden of establishing the right to class certification. *See In re Am. Med. Sys.*, 75 F.3d 1069, 1086 (6th Cir. 1996).

It is well established that *pro se* litigants are "inadequate class representatives." *Garrison v. Mich. Dep't of Corr.*, 333 F. App'x 914, 919 (6th Cir. 2009) (citations omitted); *Ziegler v.*

11

*Michigan*, 59 F. App'x 622, 624 (6th Cir. 2003) (recognizing that "[g]enerally pro se prisoners cannot adequately represent a class" (citing *Fymbo v. State Farm & Cas. Co.*, 213 F.3d 1320, 1321 (10th Cir. 2000))); *Dodson v. Wilkinson*, 304 F. App'x 434, 438 (6th Cir. 2008) (recognizing that "[p]ro se prisoners generally may not bring class action lawsuits concerning prison conditions" (citing *Dean v. Blanchard*, 865 F.2d 257 (6th Cir. 1988) (table); *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975))); *Palasty v. Hawk*, 15 F. App'x 197, 200 (6th Cir. 2001) (concluding that "pro se prisoners are not able to represent fairly [a] class" (citing *Fymbo*, 213 F.3d at 1321; *Oxendine*, 509 F.2d at 1407)); *Marr v. Michigan*, No. 95-1794, 1996 WL 205582, at *1 (6th Cir. Apr. 25, 1996) (noting that "an imprisoned litigant who is not represented by counsel may not represent a class of inmates because the prisoner cannot adequately represent the interests of the class" (citing *Oxendine*, 509 F.2d at 1407)). Because Plaintiff Sanders is an incarcerated *pro se* litigant, the Court finds that he is not an appropriate representative of a class. Therefore, the Court will deny Plaintiff Sanders' request for class certification.

## III.    Malice

Because the instant complaint repeats many claims that Plaintiff Sanders has previously raised in the federal courts, the Court must determine whether the complaint is malicious as to him.

### A.    Standard

Plaintiffs generally have "no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendants." *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir. 1977). Accordingly, as part of its inherent power to administer its docket, a district court may dismiss a suit that is duplicative of another federal court suit. *See Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *Adams v. California Dep't of Health Serv.*, 487 F.3d 684, 688 (9th Cir. 2007); *Missouri v. Prudential Health Care Plan, Inc.*, 259 F.3d 949, 953–54 (8th Cir. 2001); *Curtis v. Citibank, N.A.*, 226 F.3d

133, 138–39 (2d Cir. 2000); *Smith v. SEC*, 129 F.3d 356, 361 (6th Cir. 1997). The power to dismiss a duplicative lawsuit is meant to foster judicial economy and the "comprehensive disposition of litigation," *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952), and to protect parties from "the vexation of concurrent litigation over the same subject matter." *Adam v. Jacobs*, 950 F.2d 89, 93 (2d Cir. 1991).

Moreover, prisoners who bring civil actions *in forma pauperis* face additional constraints due to statutory barriers when bringing duplicative claims. *See, e.g.*, *Bailey v. Johnson*, 846 F.2d 1019, 1021 (5th Cir. 1988) (per curiam) ("[T]he court's power of dismissal in IFP cases under section 1915(d)[9] is broader than in other civil cases under the Federal Rules of Civil Procedure."). The PLRA commands that district courts "shall review . . . as soon as practicable . . . a complaint in which a prisoner seeks redress from a governmental entity or officer" and dismiss it if it "is frivolous, malicious, or fails to state a claim . . . ." 28 U.S.C. § 1915A.

The Sixth Circuit has not provided clear guidance as to the meaning of "malicious" in § 1915A(b)(1) or its analogues in § 1915(e)(2)(B) and 42 U.S.C. § 1997e(c)(2).[10] However, the Eleventh Circuit recently joined all other circuits that have confronted the question to conclude that a "duplicative complaint is an abuse of the judicial process and is properly dismissed without prejudice as malicious" for prisoners suing governmental entities and those proceeding *in forma pauperis*. *Daker v. Ward*, 999 F.3d 1300, 1308 (11th Cir. 2021); *accord Day v. Toner*, 530 F. App'x 118, 121 (3d Cir. 2013) ("[A] complaint is malicious where it is abusive of the judicial

---

[9] Prior to April 26, 1996, the provisions in § 1915(e)(2) were set forth at 28 U.S.C. § 1915(d).

[10] 28 U.S.C. § 1915A requires a court to screen prisoners complaints seeking redress from a governmental entity or officer. Section 1915(e) requires that a court dismiss an action, in whole or in part, if it is malicious, where a plaintiff is proceeding *in forma pauperis*. In a related statute, 42 U.S.C. § 1997e(c) requires that a court dismiss an action, in whole or in part, if it is malicious, where a prisoner challenges prison conditions under federal law. Frequently, a prisoner who brings a civil rights case is subject to all three.

process and merely repeats pending or previously litigated claims . . . ."); *Bailey v. Johnson*, 846 F.2d 1019, 1021 (5th Cir. 1988) ("[R]epetitious litigation of virtually identical causes of action may be dismissed under 28 U.S.C. § 1915(d) as malicious." (alteration in original)); *Aziz v. Burrows*, 976 F.2d 1158, 1158–59 (8th Cir. 1992) (confirming rule under former § 1915(d) that a district court may dismiss duplicative complaints as malicious); *Cato v. United States*, 70 F.3d 1103, 1105 n.2 (9th Cir. 1995) (noting that dismissal without prejudice of an action under 28 U.S.C. § 1915 when the complaint "merely repeats pending or previously litigated claims," serves Congress' goal of limiting plaintiffs from filing "frivolous, malicious, or repetitive lawsuits" (citations omitted)); *McWilliams v. Colorado*, 121 F.3d 573, 574 (10th Cir. 1997) ("[R]epetitious litigation of virtually identical causes of action may be dismissed under § 1915 as frivolous or malicious." (quotation marks omitted, first alteration in original)); *Crisafi v. Holland*, 655 F.2d 1305, 1309 (D.C. Cir. 1981) (explaining that a complaint brought by a pauper "that merely repeats pending or previously litigated claims" is abusive and "[a] complaint plainly abusive of the judicial process is properly typed malicious"); *see also Hurst v. Counselman*, 436 F. App'x 58, 60–61 (3d Cir. 2011) (concluding that the plaintiff's duplicative action evinced an attempt to vex, injure or harass a defendant and was therefore properly dismissed as malicious); *Davis v. Bacon*, 234 F. App'x 872, 874 (10th Cir. 2007) (affirming dismissal of a complaint as frivolous and malicious because it "substantially mirror[ed] the prior complaint"); *Pittman v. Moore*, 980 F.2d 994, 995 (5th Cir. 1993) (concluding "it is 'malicious' for a pauper to file a lawsuit that duplicates allegations of another pending federal lawsuit" filed by the same plaintiff); *Van Meter v. Morgan*, 518 F.2d 366, 367 (8th Cir. 1975) (affirming the dismissal of a complaint as frivolous where the plaintiff proceeding with pauper status already had filed similar complaints, one of which was currently pending and "deal[t] with issues directly related, if not identical, to these herein").

14

Therefore, this Court concurs with the uniform practices of the seven circuits that have confronted the issue: a complaint challenging prison conditions under federal law brought by a prisoner proceeding *in forma pauperis* that repeats pending or previously litigated claims is properly dismissed without prejudice as malicious under the PLRA. Yet, several circuits have further indicated that a complaint need only be *substantially* similar to previous or pending claims for a court to dismiss the complaint as malicious. *See, e.g.*, *Davis*, 234 F. App'x at 874; *Van Meter*, 518 F.2d at 367. For example, notwithstanding permissive joinder under Rule 20(a)(2) of the Federal Rules of Civil Procedure, the Fifth Circuit permits dismissals for malice where a plaintiff brings a subsequent complaint against new defendants with claims arising out of the transaction or occurrence as an earlier complaint. *See, e.g.*, *Bailey*, 846 F.2d at 1020, 1021 (affirming the district court's dismissal as malicious of an action alleging similar facts as an earlier action but against a new defendant). Clearly, even some partially duplicative complaints may abuse the judicial process, particularly where a court concludes that the plaintiff intends to vex, injure or harass a defendant.

Dismissing as malicious substantially duplicative or similar complaints serves multiple purposes. First, the practice conserves judicial resources. Conservation of judicial resources permits courts to identify and resolve other pending matters with urgency including, for example, legitimate claims brought by prisoners who are in imminent danger. Indeed, Congress created the PLRA to address "the skyrocketing numbers of claims filed by prisoners—many of which are meritless—and the corresponding burden those filings have placed on the federal courts." *Hampton v. Hobbs*, 106 F.3d 1281, 1286 (6th Cir. 1997). Dismissals of subsequent but substantially similar complaints as malicious therefore aid judicial economy. *Cf. Kerotest Mfg. Co.*, 342 U.S. at 183.

Second, it limits a vexatious litigant from filing lawsuits with similar factual allegations and claims against the same or overlapping defendants. The PLRA extends a federal court's inherent power to dismiss as frivolous a duplicative complaint, *see, e.g.*, *Colo. River Water Conservation Dist.*, 424 U.S. at 817, because it permits a federal court to dismiss as malicious a substantially duplicative complaint, *see Davis*, 234 F. App'x at 874; *Pittman*, 980 F.2d at 995. Substantially duplicative complaints, when filed without good cause, abuse the judicial process and may subject defendants to "the vexation of concurrent litigation over the same subject matter." *Adam*, 950 F.2d at 93.

An example illustrates the point. A prisoner-plaintiff proceeding with pauper status may bring, for example, Claims A, B, and C against a defendant in the first complaint. Suppose that only Claim A survives preliminary screening under 28 U.S.C. § 1915A, and the plaintiff therefore avoids a strike under 28 U.S.C. § 1915(g). While the first action remains pending, the plaintiff may then file a new action with a complaint alleging Claims A, D, and E against the same defendant; and a third action with a complaint alleging Claims A, F, and G against the original defendant. Notwithstanding differences between the complaints, the presence of Claim A would permit all three actions to proceed beyond the preliminary screening required by the PLRA even if only Claim A survived in each. The original defendant would face three separate actions.

Furthermore, absent the ability to dismiss without prejudice substantially similar complaints as malicious, a prisoner-plaintiff may circumvent the three-strikes provision of 28 U.S.C. § 1915(g). Whether inadvertent or deliberate, a plaintiff could be shielded from receiving strikes by appending any new claims he desires to bring and reasserting a previous claim that alleged facts sufficient to state a claim. Such a result would undermine Congress' objectives with

16

the PLRA "to put in place economic incentives that would prompt prisoners to" proceed prudently. *See Hampton*, 106 F.3d at 1286.

Finally, a dismissal without prejudice of a substantially similar complaint would ensure that the plaintiff does not suffer gratuitous harm. *Cf. Strandlund v. Hawley*, 532 F.3d 741, 745–46 (8th Cir. 2008) (interpreting "gratuitous harm" in the context of remedying misjoinder). The plaintiff would remain able to refile a new complaint after eliminating the duplicative claims.

For all of the foregoing reasons, this Court concludes that partially duplicative complaints aimed at vexing, injuring or harassing defendants, and that therefore abuse the judicial process, should be dismissed without prejudice as malicious pursuant to the PLRA.

### B. Analysis

As stated above, this is Plaintiff Sanders' seventh case of seven against Defendant Macauley since September 2020. As discussed more thoroughly below, Plaintiff filed the first of the seven actions soon after it became apparent that he would not satisfy the conditions placed on him to qualify for parole. Although Sanders has filed seven cases against Macauley since September 2020, no claim against Macauley has survived preliminary screening.[11] Sanders has not been deterred. Recently, in *Sanders VI*, the court dismissed the complaint as malicious because it raised several claims that Sanders raised in previous or pending actions. Sanders again raises many of the same claims here. For the reasons described below, the Court therefore concludes that, as to Plaintiff Sanders, the complaint is properly dismissed as malicious.

According to *Sanders II*, Plaintiff Sanders began filing complaints at an accelerated rate after IBC indefinitely suspended in August 2020 a prison program and thereby delayed his

---

[11] Plaintiff Sanders has also been instructed that he cannot maintain a § 1983 claim against Defendant Macauley, the warden of IBC, merely premised on a theory of respondeat superior. *See, e.g.*, *Sanders I*, 2020 WL 5757387, at *3–4; *Sanders II*, 2020 WL 6110787, at *13.

anticipated parole. *See Sanders II*, 2020 WL 6110787, at *2–3. "Plaintiff's earliest release date was September 1, 2009, and his maximum discharge date is June 16, 2025." *Id.* at *2. From 2008 to 2017, Sanders accrued approximately 300 misconduct tickets. *Id.* Many of the tickets were for sexual misconduct reporting that he verbally harassed or exposed himself to female staff. *Id.* Although Sanders went more than two years from 2017 to late 2019 without a misconduct and he was not convicted of any sex offenses, parole board members informed Sanders in December 2019 that he would need to complete the Michigan Sex Offender Program (MSOP) before he could gain parole. *Id.* Sanders began the MSOP and apparently was not a model participant. *Id.* at *2–3. He was kicked out between April and July 2020. *See id.* By July 30, 2020, he had returned to the MSOP. *See id.* However, the MSOP group leader suspended the program shortly thereafter in late August 2020, presumably because of the COVID-19 pandemic. *Id.* at *3. Sanders therefore remained unable to complete the conditions imposed on him to qualify for parole, and he filed his complaint in that action on September 14, 2020.

Less than a week earlier, on September 8, 2020, Sanders filed *Sanders I*, the first of his seven civil actions since September 1, 2020. In his *Sanders I* complaint, Sanders described conduct at IBC from March to late August 2020, related to the facility's response to the COVID-19 pandemic. A review of the court's opinion partially dismissing his *Sanders I* complaint reveals that many of Sanders' allegations from *Sanders I* are repeated in his instant complaint. Sanders alleged IBC staff entered the facility without testing. *Sanders I*, 2020 WL 5757387, at *1. Sanders averred that prisoners who worked as porters cleaning IBC were not provided personal protective gear and only received a water-sodium mixture to decontaminate surfaces rather than bleach.[12] *Id.*

---

[12] In the instant complaint, Sanders omits any mention of what prisoners have been provided and instead alleges only that prisoners have not been provided bleach.

He asserted that when he went to the control center to pick up legal mail or to healthcare services, the areas were crowded, and prisoners were not socially distanced.[13] *Id.* at *1, 2. Sanders also stated that some IBC personnel refused to wear masks properly. *Id.* at *2.

In *Sanders I*, Sanders named, among others, the following defendants: Warden Matt Macauley, Deputy Warden Unknown Walzach,[14] and an unknown Health Services Unit Manager. *Id.* at *1. The above allegations and defendants are repeated in the instant complaint.

Later in *Sanders III*, which Sanders filed on January 19, 2021, he alleged that the defendants in that action suspended legal library services in August 2020 after several IBC prisoners tested positive for COVID-19. *Sanders III*, 2021 WL 1049876, at *1. In *Sanders III*, Sanders named, among others, Warden Matt Macauley as a defendant. The *Sanders III* complaint was dismissed on preliminary screening because Sanders' allegations failed to state a claim. In the opinion dismissing the claims, the court explained that Sanders could not maintain his access-to-the-courts claim because he failed to show that he suffered an "actual injury." *See Sanders III*, 2021 WL 1049876, at *4. Notwithstanding that court's explanation, Sanders raises a similar claim here without any allegation of an actual injury. Sanders also again names Warden Macauley as a defendant in the instant complaint.

*Sanders IV* was created by the severance of Plaintiff Sanders' claims from the claims of another plaintiff. In an amended complaint in *Franklin v. Washington*, No. 1:21-cv-313 (W.D. Mich.), Sanders joined an ongoing action initiated by another prisoner. The court severed Sanders'

---

[13] The instant complaint flips this argument on its head. Plaintiff Sanders now argues that Defendant Macauley violated the rights of COVID-positive and close-contact prisoners who are restricted from traveling to the IBC 300 building. Presumably the restrictions aim to limit the risk of spreading COVID-19 to unexposed units within the prison.

[14] Throughout his litigation, Plaintiff Sanders has referred to Deputy Warden Unknown Walzach by several different spellings of the surname. For consistency, the Court will use the name that Sanders has used in the instant complaint.

claims into a new, related action, *see Franklin*, No. 1:21-cv-313 (W.D. Mich. June 16, 2021) (ECF No. 9, PageID.307–311), which resulted in *Sanders IV*.

The amended complaint in *Sanders IV* again raised allegations like those in the instant complaint, and against an overlapping set of defendants. In his amended complaint, Sanders again alleged that IBC staff did not undergo mandatory testing for COVID-19 and as a result, staff entered the facility while sick with COVID-19. *Sanders IV*, (W.D. Mich. July 7, 2021) (Am. Compl., ECF No. 12, PageID.325, 332). He stated that prison porters cleaned without "proper" personal protective equipment or cleaning supplies. *Id.*, (PageID.330.) After Plaintiff tested positive in February 2021, he was placed in an isolation unit where IBC personnel did not perform medical rounds, did not collect grievances, did not process legal mail, and custody and administrative staff did not conduct rounds on the unit. *Id.*, (PageID.327, 329, 336, 337, 341). In *Sanders IV*, Plaintiff sued Warden Macauley, Deputy Warden Walzach, the unknown Healthcare Unit Manager, and the unknown Healthcare Unit Supervisor. Here, Sanders again raises claims similar to those from *Sanders IV* described above, and he repeats all of the defendants described above in the instant complaint.

Sanders filed his complaint in *Sanders VI* on December 29, 2021, just nine days before he filed the instant complaint. The court in *Sanders VI* described his complaint in that action as an "omnibus complaint" because it did "nothing more than duplicate claims and allegations that [Sanders] ha[d] previously brought . . . ." *Sanders VI*, 2022 WL 247831, at *7. Specifically, Sanders again alleged that defendants did not require all IBC staff to test for COVID-19 prior to entering the facility. Sanders further argued that prisoners were not required to properly distance themselves from each other. He asserted that defendants did not fumigate or sanitize areas of the prison that he believed led to the spread of COVID-19 at IBC. Sanders alleged that porters cleaned

units without protective gear, and they were denied bleach. Sanders averred that, when he was in quarantine and isolation related to COVID-19 contact and diagnosis, respectively, defendants did not perform regular medical rounds on his unit, nor did they pick up or distribute legal mail. The court dismissed that complaint as frivolous and malicious because Sanders had brought the same or similar COVID-related claims against an overlapping set of defendants. *See id.* That court further concluded that Sanders intended to vex and harass multiple defendants including Warden Macauley. *See id.* In *Sanders VI*, Sanders again sued Warden Macauley, Deputy Warden Walzach, the unknown Healthcare Unit Manager, and the unknown Healthcare Unit Supervisor. In the instant action, Sanders again raises claims similar to or the same as those described above from *Sanders VI*. He also again sues the four defendants identified above.

In sum, Plaintiff's instant complaint raises several of the same or virtually the same issues he raised in four earlier actions against an overlapping set of defendants. In each of these five actions—*Sanders I*, *Sanders III*, *Sanders IV*, *Sanders VI*, and the instant action, *Sanders VII*—Plaintiff has challenged IBC's efforts to address the risks posed by the ongoing global COVID-19 pandemic.[15] Many claims that Sanders brings in this action are similar to or the exact same as those he has previously brought. In fact, the instant complaint is at least the third time Sanders has argued that IBC's failure to mandate COVID-19 testing for staff violated the Eighth Amendment. For the above reasons, the Court will dismiss him from the action because, as to him, the complaint is malicious.

---

[15] The Court further notes that the instant complaint, like those that have come before it, arguably contain claims against misjoined defendants. *See Proctor v. Applegate*, 661 F. Supp. 2d 743, 778 (E.D. Mich. 2009) ("[A] civil plaintiff may not name more than one defendant in his original or amended complaint unless one claim against each additional defendant is transactionally related to the claim against the first defendant and involves a common question of law or fact." (internal quotation marks omitted)).

This Court will further join the court from *Sanders VI* in concluding that Sanders intends to vex and harass multiple Defendants, particularly Defendant Macauley, IBC's warden.[16] *See Sanders VI*, 2022 WL 247831, at *7. Although most circuits apply an objective standard when determining malice, at least one circuit has suggested that a court must inquire into the subjective motivations of the plaintiff "to determine whether the action is an attempt to vex, injure, or harass" any defendant. *See Hurst*, 436 F. App'x at 60. The complaint in this action represents Sanders' seventh attempt to sue Defendant Macauley since September 1, 2020. None of Sanders' claims against Defendant Macauley in these prior actions have survived preliminary screening. Yet, Sanders continues to name Defendant Macauley as a defendant, including in the instant action. Moreover, the rapid succession of actions follows the postponement of Sanders' anticipated parole, for which he sued Defendant Macauley.

Additionally, the Court further takes note of the sincerity of the concern with which Sanders maintains some of his claims. In several of Sanders' actions, including the current one, he argues that Defendant Macauley has violated his Eighth Amendment rights because several prison staff somewhere at IBC did not wear their masks properly. According to Sanders' own allegations in a previous complaint, he has not worn his own mask properly. Sanders waited in an IBC medical line one day with his mask buried in his pocket rather than on his face. *See Sanders V*, 2021 WL 5997284, at *2 ("Defendant Smith told Plaintiff [Sanders] to put his mask on. Plaintiff [Sanders] state[d] that it took a minute to retrieve the mask from his pocket . . . ."). Sanders did not have quick access to his mask even when directed to put it on. According to the complaint in that action,

---

[16] Indeed, although Defendant Macauley is the warden of IBC and Plaintiff Sanders has previously been instructed on the limits of supervisory liability for § 1983 claims, *see, e.g.*, *Sanders I*, 2020 WL 5757387, at *3–4, Macauley is purportedly responsible for the conduct in 11 of the complaint's 13 claims.

when a corrections officer challenged Sanders to hurry up, allegedly in a reprehensible manner, Sanders stated that he said he would file grievances on any officer he saw without a mask. *See id.* Sanders' earlier conduct certainly does not forfeit his right to bring an Eighth Amendment claim related to masking during the COVID-19 pandemic, but his conduct adds context to an issue he has raised in multiple complaints.

Thus, to the extent this Court must consider Sanders' subjective motivations, the facts described above—when taken together with Sanders' duplicative allegations and claims—provide a clear inference that Sanders intends to vex and harass Defendant Macauley and perhaps others.

Substantially or virtually duplicative claims, like those filed here, bring multiple harms. They are time-consuming and divert judicial resources away from other pressing matters, including complaints filed by prisoners who face legitimate and original problems with their prison conditions. They also subject defendants to serial and vexatious litigation related to the same conduct. Thus, for all the foregoing reasons, the Court will dismiss Plaintiff Sanders from the action because, as to him, the complaint is malicious.[17]

## IV.   Failure To State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The

---

[17] Plaintiff Sanders is further warned that continued attempts to file duplicative claims may result the Court issuing a motion to show cause why he should not be sanctioned under Rule 11 of the Federal Rules of Civil Procedure.

court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Plaintiffs[18] allege over a dozen constitutional violations. They allege that multiple Defendants violated their Eighth Amendment rights. Plaintiffs further assert that Defendant Macauley violated their First and Fourteenth Amendment rights. Finally, Plaintiffs argue that Defendants Lemke and Ritter violated their rights to access the courts.

---

[18] Henceforth, "Plaintiffs" will refer to all Plaintiffs except for Plaintiff Sanders.

### A.    Eighth Amendment

Plaintiffs allege that Defendants Macauley, Walzach, Hadden, Stuntman, Healthcare Unit Manager Unknown Part(y)(ies) #1, and Healthcare Unit Supervisor Unknown Part(y)(ies) #2 violated their Eighth Amendment rights.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

Plaintiffs contend that Defendants violated their Eighth Amendment rights under different theories. First, Plaintiffs assert that Defendant Macauley restricted prisoners who were quarantining or positive with COVID-19, which therefore constituted cruel and unusual punishment. Second, Plaintiffs allege that Defendants Healthcare Supervisor Unknown Part(y)(ies) #1 and Healthcare Manager Unknown Part(y)(ies) #2 did not conduct health care rounds on COVID-negative prisoners in violation of the Eighth Amendment. Finally, Plaintiffs argue that Defendants were deliberately indifferent to the risk posed to them by the COVID-19 pandemic.

### 1.    Exercise yard privileges and access to IBC 300 building

Plaintiffs allege that Defendant Macauley enforced restrictions on quarantining and COVID-positive prisoners that limited the time they could exercise in the prison yard and that precluded them from going to the IBC 300 building. They allege that those policies constitute cruel and unusual punishment. To the extent that Plaintiffs claim that Defendant Macauley's enforcement of these policies violated the Eighth Amendment, their allegations fail to state a claim.

"Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347). As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.* Restrictions that are "restrictive or even harsh," but are not cruel and unusual under contemporary standards, are not unconstitutional. *Rhodes*, 452 U.S. at 347. "To move beyond the pleading stage . . . , an inmate must allege that he has been deprived 'of the minimal civilized measure of life's necessities.'" *Harden-Bey v. Rutter*, 524 F.3d 789 (6th Cir. 2008) (quoting *Rhodes*, 452 U.S. at 347).

Neither temporarily reducing Plaintiffs' recreation time nor temporarily denying access to the IBC 300 building deprived Plaintiffs of the minimal civilized measure of life's necessities.

Plaintiffs utterly fail to explain why their restriction from IBC 300 building constitutes cruel and unusual punishment in violation of the Eighth Amendment. They simply conclude that the restriction violates their constitutional rights.[19] However, conclusory allegations of

---

[19] To the extent that Plaintiffs suggest some denial of mental health services, they again fail to state a claim. They allege neither that any Plaintiff has required mental health services nor that any Plaintiff was refused mental health services. The MDOC policies in force at the time specifically state that "[p]sychological services shall continue to be provided as necessary" to prisoners in isolation. *See* COVID-19 Director's Office Memorandum 2021-26R12, at 8. Plaintiff's allegations do not suggest that Defendants failed to comply with that policy.

unconstitutional conduct without specific factual allegations fail to state a claim under § 1983. *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555.

Additionally, any reduction in Plaintiffs' exercise time while isolating is simply too brief to deprive them of the minimal civilized measure of life's necessities. Plaintiffs allege that they were not exposed to COVID-19 until at least December 16, 2021. Plaintiffs purportedly all signed the complaint on December 25, 2021. (Compl., ECF No. 1, PageID.14–18.) Consequently, the allegations suggest that they were in an isolation unit for less than two weeks at the time they filed their complaint. "[T]otal or near-total deprivation of exercise or recreational opportunity, without penological justification, violates Eighth Amendment guarantees." *Rodgers v. Jabe*, 43 F.3d 1082, 1086 (6th Cir. 1995) (quoting *Patterson v. Mintzes*, 717 F.2d 284, 289 (6th Cir. 1983)); *see also Argue v. Hofmeyer*, 80 F. App'x 427 (6th Cir. 2003). Defendant Macauley's enforcement of policies appears reasonable in trying to limit the spread of COVID-19 within the prison. For this reason, the enforcement of the policy appears to have a penological justification.

But Plaintiffs' claims fail for other reasons. It is well established that allegations about temporary inconveniences do not demonstrate that the conditions fell beneath the minimal civilized measure of life's necessities as measured by a contemporary standard of decency. *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001); *see also J.P. v. Taft*, 439 F. Supp. 2d 793, 811 (S.D. Ohio 2006). Plaintiffs' reduction in their time to use the prison yard for a few weeks in December 2020 and January 2021 describes nothing more than a temporary inconvenience. Moreover, Plaintiffs do not allege that their cells were too small to permit additional exercise or that they suffered any ill effects from the temporary limitation on their yard privileges. *See, e.g.*, *May v. Baldwin*, 109 F.3d 557, 565–66 (9th Cir. 1997) (holding that denial of out-of-cell exercise for 21 days did not rise to Eighth Amendment violation); *Knight v. Armontrout*, 878 F.2d 1093,

1096 (8th Cir. 1989) ("Denial of recreation for a short period, per se, is not a constitutional violation."); *Davenport v. DeRobertis*, 844 F.2d 1310 (8th Cir. 1988) (upholding a 90-day segregation threshold before five hours of weekly out-of-cell exercise is required), *cited with approval in Pearson v. Ramos*, 237 F.3d 881, 884–85 (7th Cir. 2001); *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988) (holding that there was no Eighth Amendment violation when the plaintiff was held in segregation without outdoor exercise for 28 days).

Thus, for all the reasons discussed above, Plaintiffs fail to state an Eighth Amendment claim for restrictions on exercise time and access to the IBC 300 building.

### 2. Health care rounds on quarantine/isolation unit

Plaintiffs' next Eighth Amendment claim asserts that Defendants Healthcare Supervisor Unknown Part(y)(ies) #1 and Healthcare Manager Unknown Part(y)(ies) #2 did not conduct regular rounds on the Unit 5 to check the health of those prisoners without COVID-19. To be sure, MDOC's COVID-19 policies restrict staff from entering isolation areas. *See* COVID-19 Director's Office Memorandum (DOM) 2021-26R12, at 8. However, there are no allegations that any Defendant refused to respond to any healthcare needs. In short, no Plaintiff has alleged facts suggesting that the failure to conduct regular healthcare rounds subjected him to "unnecessary and wanton infliction of pain," *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), or that he was exposed to conditions below "contemporary standards of decency," *Hudson*, 503 U.S. at 8. Consequently, Plaintiffs fail to state an Eighth Amendment claim against Defendants Healthcare Supervisor Unknown Part(y)(ies) #1 and Healthcare Manager Unknown Part(y)(ies) #2 for not conducting regular health care rounds on a COVID-19 isolation unit.

### 3. Risks of COVID-19

Plaintiffs also allege that they were incarcerated under conditions that put them at risk of contracting COVID-19. Reading Plaintiffs' complaint with all due liberality, *see Haines*, 404 U.S.

at 520, Plaintiffs contend that Defendants failed generally to prevent an outbreak of COVID-19 on Unit 5 at IBC because they did not order mandatory testing for all IBC staff before entering the facility. Plaintiffs assert that Defendants failed to enforce staff PPE requirements, failed to provide additional PPE for porters to change into after entering cells of COVID-positive prisoners, and failed to provide PPE for COVID-negative prisoners on Unit 5. Plaintiffs further aver that Defendant Macauley did not provide prisoners bleach to clean their cells, and he permitted COVID-negative prisoners to use the showers after COVID-positive prisoners without "properly sanitiz[ing] . . . ." (Compl., ECF No. 1, PageID.10.) Plaintiffs allege that Defendants housed prisoners who had tested positive for COVID-19 on the same unit, and in the same cell, as those prisoners who had not tested positive for COVID-19. Finally, Plaintiffs contend that Defendant Stuntman twice entered Unit 5 while positive with COVID-19.

In order for a prisoner to prevail on an Eighth Amendment deliberate indifference claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[P]rison officials who actually knew of a substantial risk to

inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

### a.    Objective prong

In a 2020 case brought by federal prisoners under 28 U.S.C. § 2241, the Sixth Circuit addressed the issue of whether the Bureau of Prisons (BOP) violated the Eighth Amendment rights of medically vulnerable inmates at the Elkton Federal Correctional Institution by failing to adequately protect them from COVID-19 infection. *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020). In the opinion, the Sixth Circuit found that the plaintiffs in *Wilson* had easily satisfied the objective component of an Eighth Amendment claim:

> The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death. The BOP acknowledges that "[t]he health risks posed by COVID-19 are significant." CA6 R. 35, Appellant Br., PageID 42. The infection and fatality rates at Elkton have borne out the serious risk of COVID-19, despite the BOP's efforts. The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other—and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death. Petitioners have put forth sufficient evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

*Id.* at 840.

However, the Sixth Circuit issued *Wilson* in the first few months of the COVID-19 pandemic, and much changed between June 2020 and December 2021. By early 2021, the FDA authorized for emergency use three different COVID-19 vaccines.[20] *See Does v. Mills*, 595 U.S. ___, 142 S. Ct. 17, 21 (2021) (Gorsuch, J., dissenting) (dissenting from the denial of an application

---

[20] By the end of January 2022, the FDA fully approved of two out of the three vaccines. *See* FDA, *Coronavirus (COVID-19) Update: FDA Take Key Action by Approving Second COVID-19 Vaccine* (Jan. 31, 2022), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-takes-key-action-approving-second-covid-19-vaccine.

for injunctive relief and noting that the COVID-19 situation had changed between 2020 and late 2021). During 2021, MDOC gave prisoners an opportunity to get vaccinated, and many prisoners seized the opportunity. By January 7, 2022, 68 percent of MDOC prisoners were fully vaccinated. *See* Emergency Order under MCL 333.2253 – Requirements for Prisons (Jan. 13, 2022), https://www.michigan.gov/documents/coronavirus/MDHHS_Prison_Requirements_Order_Jan._ 13_2022_-_FINAL_745729_7.pdf. The FDA has further approved or authorized treatments for those who fall ill with COVID-19. *See* FDA, *Know Your Treatment Options for COVID-19* (Jan. 27, 2022), https://www.fda.gov/consumers/consumer-updates/know-your-treatment-options-covid-19. Put simply, COVID-19 did not pose the same risk to prisoners in late 2021 that it did 18 months earlier in the summer of 2020 when the Sixth Circuit issued *Wilson*.

Nonetheless, at this stage in the proceedings, the Court will adhere to the standard set forth by the Sixth Circuit in *Wilson*. Under that precedent, a medically vulnerable plaintiff may satisfy the objective prong by alleging conditions that could facilitate COVID-19 transmission within a prison and the health risks posed by the virus. Plaintiffs allege conditions that could facilitate COVID-19 transmission within their prison, but they do not clearly state that they suffer from any conditions that make them medically vulnerable. Yet, at this early stage, the Court concludes that Plaintiffs allege facts sufficient to satisfy the objective prong of the deliberate indifference test.

### b.    Subjective prong

Notwithstanding Plaintiffs' ability to satisfy the objective prong, they fail to allege facts sufficient to satisfy the subjective prong of the deliberate indifference test in any of their claims. The Sixth Circuit went on in *Wilson* to address the subjective prong of an Eighth Amendment claim, noting that the pertinent question was whether the BOP's actions demonstrated deliberate indifference to the serious risk of harm posed by COVID-19 in the prison.

There is no question that the BOP was aware of and understood the potential risk of serious harm to inmates at Elkton through exposure to the COVID-19 virus. As of April 22, fifty-nine inmates and forty-six staff members tested positive for COVID-19, and six inmates had died. "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). The BOP acknowledged the risk from COVID-19 and implemented a six-phase plan to mitigate the risk of COVID-19 spreading at Elkton.

The key inquiry is whether the BOP "responded reasonably to th[is] risk." *Farmer*, 511 U.S. at 844. The BOP contends that it has acted "assiduously to protect inmates from the risks of COVID-19, to the extent possible." CA6 R. 35, Appellant Br., PageID 42. These actions include

> implement[ing] measures to screen inmates  for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings; conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff.

*Id.* at 42–43.

The BOP argues that these actions show it has responded reasonably to the risk posed by COVID-19 and that the conditions at Elkton cannot be found to violate the Eighth Amendment. We agree.

Here, while the harm imposed by COVID-19 on inmates at Elkton "ultimately [is] not averted," the BOP has "responded reasonably to the risk" and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights. *Farmer*, 511 U.S. at 844. The BOP implemented a six-phase action plan to reduce the risk of COVID-19 spread at Elkton. Before the district court granted the preliminary injunction at issue, the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks. The BOP initially struggled to scale up its testing capacity just before the district court issued the preliminary injunction, but even there the BOP represented that it was on the cusp of expanding testing. The BOP's efforts to expand testing demonstrate the opposite of a disregard of a serious health risk.

*Id.* at 840–41.

In its decision, the Sixth Circuit recognized that other Sixth Circuit decisions have found similar responses by prison officials and medical personnel, such as cleaning cells, quarantining infected inmates, and distributing information about a disease in an effort to prevent spread, to be reasonable. *Id.* at 841 (citing *Wooler v. Hickman Cnty.*, 377 F. App'x 502, 506 (6th Cir. 2010); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014); *Harrison v. Ash*, 539 F.3d 510, 519–20 (6th Cir. 2008); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018)). The *Wilson* Court also noted that other circuits had concluded that similar actions by prison officials demonstrated a reasonable response to the risk posed by COVID-19:

> In *Swain* [*v. Junior*], the Eleventh Circuit granted a stay of a preliminary injunction pending appeal on state inmates' Eighth Amendment claims. 958 F.3d [1081,] 1085 [(11th Cir. 2020) (per curiam)]. The Eleventh Circuit held that "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence,'" and "the evidence supports that [Metro West Detention Center ("MWDC") is] taking the risk of COVID-19 seriously." *Id.* at 1088–90 (citation omitted). In response to the pandemic in early March, MWDC began "cancelling inmate visitation; screening arrestees, inmates, and staff; and advising staff of use of protective equipment and sanitation practices" and, after reviewing further CDC guidance, began "daily temperature screenings of all persons entering Metro West, establish[ed] a 'COVID-19 Incident Command Center and Response Line' to track testing and identify close contacts with the virus, develop[ed] a social hygiene campaign, and mandate[d] that staff and inmates wear protective masks at all times." *Id.* at 1085–86. The Eleventh Circuit held that, because MWDC "adopted extensive safety measures such as increasing screening, providing protective equipment, adopting [physical] distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures," MWDC's actions likely did not amount to deliberate indifference. *Id.* at 1090.
>
> Similarly, the Fifth Circuit granted stays of two preliminary injunctions in *Valentine* [*v. Collier*, 956 F.3d 797 (5th Cir. 2020) (per curiam),] and *Marlowe* [*v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam)]. In *Valentine*, inmates at Texas's Wallace Pack Unit filed a class action suit against the Texas Department of Criminal Justice ("TDCJ") alleging violations of the Eighth Amendment. 956 F.3d at 799. In response to the COVID-19 pandemic, TDCJ had taken preventative measures such as providing "access to soap, tissues, gloves, [and] masks," implementing "regular cleaning," "quarantin[ing] of new prisoners," and ensuring "[physical] distancing during transport." *Id.* at 802. The Fifth Circuit determined that the district court applied the wrong legal standard by "collaps[ing] the objective and subjective components of the Eighth Amendment inquiry" by "treating inadequate measures as dispositive of the Defendants' mental

state" under the subjective prong and held that "accounting for the protective measures TDCJ has taken" the plaintiffs had not shown deliberate indifference. *Id.* at 802–03. In *Marlow*e, the Fifth Circuit relied on its reasoning in *Valentine* and again reiterated that there was "little basis for concluding that [the correctional center's] mitigation efforts," which included "providing prisoners with disinfectant spray and two cloth masks[,] . . . limiting the number of prisoners in the infirmary lobby[,] and painting markers on walkways to promote [physical] distancing," were insufficient. 2020 WL 2043425, at *2–3.

*Wilson*, 961 F.3d at 841–42.

After reviewing the cases, the *Wilson* Court held that even if the BOP's response to COVID-19 was inadequate, it took many affirmative actions, not only to treat and quarantine inmates who had tested positive, but also to prevent widespread transmission of COVID-19. The Court held that because the BOP had neither disregarded a known risk nor failed to take steps to address the risk, it did not act with deliberate indifference in violation of the Eighth Amendment. *Id.* at 843–44.

In addition, in *Cameron v. Bouchard,* 818 F. App'x 393 (6th Cir. 2020), the Court relied on *Wilson* to find that pretrial detainees in the Oakland County Jail were unlikely to succeed on the merits of their Eighth and Fourteenth Amendment claims. The plaintiffs in *Cameron* claimed that jail officials were deliberately indifferent to the substantial risk of harm posed by COVID-19 at the jail. The district court initially granted a preliminary injunction requiring the defendants to "(1) provide all [j]ail inmates with access to certain protective measures and medical care intended to limit exposure, limit transmission, and/or treat COVID-19, and (2) provide the district court and Plaintiffs' counsel with a list of medically vulnerable inmates within three business days." *Id.* at 394. However, following the decision in *Wilson*, the Court granted the defendants' renewed emergency motion to stay the preliminary injunction, finding that the preventative measures taken by the defendants were similar to those taken by officials in *Wilson* and, thus, were a reasonable response to the threat posed by COVID-19 to the plaintiffs. *Id.* at 395. Subsequently, in an

unpublished opinion issued on July 9, 2020, the Sixth Circuit vacated the injunction. *Cameron v. Bouchard*, 815 F. App'x 978 (6th Cir. 2020).

### (1)   General COVID-19 risks

In the instant case, Plaintiffs claim that Defendants' handling of the COVID-19 crisis at IBC violated their Eighth Amendment rights. Plaintiffs reference the MDOC's COVID-19 DOMs. (*See* Compl., ECF No. 1, PageID.3.) The MDOC issued its first COVID-19 DOM on April 8, 2020. *See* MDOC DOM 2020-30 (eff. Apr. 8, 2020) (mandating multiple protective measures including the wearing of masks by prisoners and staff, screening of all individuals before entering prison facilities, keeping of social distance, restricting visits and phone calls, and limiting transfers and cell moves). The MDOC issued eight revised DOMs during the remainder of 2020, and 12 more revised DOMs in 2021 before the start of the allegations in the complaint.

The DOMs set forth specific details about protective measures to be taken in all MDOC facilities: describing the types of PPE to be worn by staff and when; setting screening criteria for individuals entering facilities; setting social distancing requirements; establishing isolation areas and practices for isolation; setting practices for managing prisoners under investigation for COVID-19; modifying how personal property is managed; setting requirements for jail transfers; outlining communication adjustments and video visitation; upgrading hygiene, health care, and food service policies; setting protocols for COVID-19 testing of prisoners; and making other necessary adjustments to practices to manage the pandemic.

Plaintiffs' own allegations describe several steps that Defendants Macauley, Healthcare Supervisor Unknown Part(y)(ies) #1, and Healthcare Manager Unknown Part(y)(ies) #2 took to comply with the DOMs. Defendants clearly tested prisoners for COVID-19. (*See* Compl., ECF No. 1, PageID.5.) Plaintiffs further acknowledge that Defendants isolated COVID-positive prisoners and those who had come in close contact with COVID-positive individuals. (*See id.*,

PageID.5–6.) Defendants restricted from moving around the facility the COVID-positive and close-contact prisoners. (*See id.*, PageID.6, 7.) Defendants employed multiple porters to wipe down and sterilize surfaces at the prison. (*See id.*, PageID.6.) Defendants posted "multiple signs and posters" informing that the wearing of PPE was required. (*See id.*, PageID.8.) Clearly, by Plaintiffs' own admission, Defendants have taken extensive steps to address the risk posed by COVID-19 to inmates at IBC.[21] As noted by the Sixth Circuit in *Wilson*, such actions demonstrate the opposite of a disregard of a serious health risk. *Wilson*, 961 F.3d at 841; *see also Dykes-Bey v. Washington*, No. 21-1260, 2021 WL 7540173, at *3 (6th Cir. Oct. 14, 2021).

Therefore, Plaintiffs fail to state an Eighth Amendment claim against Defendants Macauley, Healthcare Supervisor Unknown Part(y)(ies) #1, and Healthcare Manager Unknown Part(y)(ies) #2 for their failure to prevent a COVID-19 outbreak on Unit 5 at IBC.

Moreover, Plaintiffs' argument that Defendants Macauley, Healthcare Supervisor Unknown Part(y)(ies) #1, and Healthcare Manager Unknown Part(y)(ies) #2 should have mandated testing for all MDOC staff similarly fails to state a claim. As an initial issue, the allegations related to the purported failure to test for COVID-19 at IBC are vague. Perhaps Plaintiffs argue that all IBC staff should be tested before entering the facility each day? Or do Plaintiffs contend that IBC staff who work on isolation units should frequently be tested? Or is there some other argument Plaintiffs intend to make? The complaint appears to invite the Court to conceive of some way in which a failure to test for COVID-19 may satisfy the subjective prong of the deliberate indifference test and to then adopt that conception. But Plaintiffs' claim must be more than conceivable, it must be plausible to survive dismissal. *See Twombly*, 550 U.S. at 570.

---

[21] Notably, Plaintiffs also complain above that Defendants took *excessive* steps to address the risk posed by COVID-19 by limiting exercise time and access to the IBC 300 building.

Furthermore, a focus on an individual decision or policy, such as testing, "ignores the 'key inquiry'" in the subjective prong analysis of a deliberate indifference claim, which is "whether the defendants 'responded reasonably to the risk.'" *Dykes-Bey*, No. 21-1260, 2021 WL 7540173, at *3 (quoting *Wilson*, 961 F.3d at 840–41); *see also Young v. Whitmer*, No. 21-2648, slip order at 5 (6th Cir. Apr. 5, 2022) (same).

More importantly, the Sixth Circuit has previously rejected deliberate-indifference claims like Plaintiffs' that argue that prison staff must test for COVID-19.[22] *See Dykes-Bey*, 2021 WL 7540173, at *1–3. Therefore, Plaintiffs fail to allege facts sufficient to satisfy the subjective prong in a claim related to Defendants' failure to test IBC staff for COVID-19.

### (2)   Bleach, showers, and PPE availability

Plaintiffs allege that Defendant Macauley "order[ed] the denial of prisoners . . . to use bleach to spray their cells" (Compl., ECF No. 1, PageID.9), "order[ed] to place positive COVID prisoners in the shower and then negative COVID prisoners in the same showers" (*id.*, PageID.10), and "deni[ed] . . . P.P.E. for negative COVID-19 prisoners" on the lower level of B Wing (*id.*, PageID.11).

---

[22] Perhaps Plaintiffs labor under the false impression that COVID-19 testing kits were readily available. That has not been the case. The nation faced several shortages of testing kits during late 2021. *See, e.g.*, Rebecca Heilweil, *How omicron broke Covid-19 testing: Rapid tests are sold out everywhere, and help might not come until next year*, https://www.vox.com/recode/2021/12/21/22848286/omicron-rapid-test-covid-19-antigen, Vox (Dec. 21, 2021, 4:01 PM EST) ("Rapid antigen tests are out of stock at many drug stores, and lines for PCR tests stretch around the block in cities across the United States.").

Those facts are so well-known to persons outside of prison and such a fundamental part of the experience of virtually every American during the rapid spread of the omicron variant that they might be proper subjects for judicial notice under Rule 201 of the Federal Rules of Evidence. Nonetheless, the information in the preceding paragraph plays no role in the Court's decision. Instead, this information merely provides context and additional information to prisoners who are incarcerated amidst the ongoing pandemic. *Cf. United States v. Mathews*, 846 F. App'x 362, 364 n.3 (6th Cir. 2021) (stating that "[p]roviding context when context matters is not misplaced").

Notwithstanding Plaintiffs' failure to explain when or in what manner Defendant Macauley, as warden of IBC, issued the purported orders or denied PPE, the allegations fail to state a claim. Plaintiffs omit any explanation of why their prison showers and prison cells posed any specific risk to COVID-negative prisoners. They offer no explanation why showers required "power wash[ing]" (*id.*, PageID.6), or why prisoners needed additional PPE or cleaning products for their cells. Any threat appears purely speculative. Further, as to the PPE and bleach, Plaintiffs do not allege that they lacked *any* masks or cleaning supplies. They appear instead to contend that Defendant Macauley refused to supply the PPE and cleaning products that they preferred.[23] Plaintiffs do not allege that they faced an increased risk of contracting COVID-19 when using the PPE and cleaning solution provided to them, nor do they allege facts demonstrating that Defendant Macauley knew of and disregarded any such risk. Moreover, it is clear that any risk was not so obvious as to permit the inference that Defendant Macauley was aware of it at the time. *See Hope*, 536 U.S. at 738. Therefore, Plaintiffs fail to allege facts sufficient to satisfy the subjective prong in a claim related to the purported orders denying bleach, denying PPE, and directing showering. *See Farmer*, 511 U.S. at 837.

### (3)    PPE for porters

Plaintiffs also allege that Defendants Macauley, Walzach, Hadden, Healthcare Supervisor Unknown Part(y)(ies) #1, and Healthcare Manager Unknown Part(y)(ies) #2 violated the Eighth Amendment because they did not provide custody staff and porters *additional* PPE to wear into the cells of COVID-negative prisoners after porters wore their PPE to enter cells of COVID-

---

[23] As noted above, Plaintiff Sanders, the purported lead Plaintiff, had a mask that he previously kept in his pocket. *See Sanders V*, 2021 WL 5997284, at *7. In his earlier litigation, Sanders has also indicated that IBC provided a sodium-based cleaning solution instead of bleach. *See, e.g.*, *Sanders I*, 2020 WL 5757387, at *1. The Court refers to Plaintiff Sanders' earlier actions merely to support that the vagueness of and gaps within Plaintiffs' instant allegations may be intentional.

positive prisoners. Plaintiffs again fail to explain the specific risk posed, in this case by custody staff and porters wearing PPE in COVID-negative prisoners' cells after wearing the same PPE into the COVID-positive prisoners' cells. Again, any specific risk appears purely speculative. Plaintiffs do not allege that they faced an increased risk of contracting COVID-19 due to the PPE practices employed by custody staff and porters, nor do Plaintiffs allege facts demonstrating that Defendants Macauley, Walzach, Hadden, Healthcare Supervisor Unknown Part(y)(ies) #1, or Healthcare Manager Unknown Part(y)(ies) #2 knew of and disregarded any such risk. Certainly, any purported risk was not so obvious as to permit the inference that Defendants Macauley, Walzach, Hadden, Healthcare Supervisor Unknown Part(y)(ies) #1, or Healthcare Manager Unknown Part(y)(ies) #2 was aware of it at the time. *See Hope*, 536 U.S. at 738. Consequently, Plaintiffs fail to allege facts sufficient to satisfy the subjective prong in a claim related to the failure to provide additional PPE to custody staff and porters. *See Farmer*, 511 U.S. at 837.

### (4)    Shared unit and cells

Plaintiffs allege that Defendants Macauley, Walzach, Hadden, Healthcare Supervisor Unknown Part(y)(ies) #1, and Healthcare Manager Unknown Part(y)(ies) #2 housed prisoners who tested positive for COVID-19 on the same unit as prisoners who had not. Plaintiffs further allege that Defendant Macauley "place[d] . . . COVID[-]positive prisoners in cells with 'close contact' prisoners . . . ." (Compl., ECF No. 1, PageID.12.)

Plaintiffs' allegations that Defendants housed prisoners who tested positive for COVID-19 on the same unit as those who had not tested positive fails to state a claim. The complaint alleges that the prisoners who tested positive for COVID-19 were placed in "the first 7 or 8 cells" of the lower level of B Wing. (*Id.*, PageID.6.) While unclear, the complaint appears to further allege that exposed prisoners who had not tested positive were placed elsewhere on the lower level of B Wing, and Defendants designated the lower level of B Wing an isolation area. The complaint does not

even explain which category Plaintiffs fall into: COVID-positive, exposed, or unexposed. Even if the Court were to assume that some or all Plaintiffs were exposed or unexposed, the allegations clearly suggest that Defendants took action to isolate prisoners who tested positive in seven or eight cells at the end of the wing. Defendants also quarantined exposed prisoners from the rest of the prison population. As stated above, such actions demonstrate the opposite of a disregard of a serious health risk. *Wilson*, 961 F.3d at 841. The complaint utterly fails to explain why placement of exposed prisoners on the same unit as COVID-positive prisoners show that any Defendant knew of and disregarded an excessive risk. Therefore, Plaintiffs may not maintain an Eighth Amendment claim against Defendants Macauley, Healthcare Supervisor Unknown Part(y)(ies) #1, and Healthcare Manager Unknown Part(y)(ies) #2 for housing prisoners who tested positive for COVID-19 on the same unit as those who had not. *See Farmer*, 511 U.S. at 837.

Similarly, Plaintiffs' purported Claim 12b, which seeks relief for "Defendant Macauley's placement of COVID[-]positive prisoners in cells with 'close contact' prisoners" fails to state a claim. (Compl., ECF No. 1, PageID.12.) First, because the complaint offers no other allegation related to this claim, Plaintiffs fail to provide enough facts for the Court to reasonably infer that Defendant Macauley violated their Eighth Amendment rights. *See Iqbal*, 556 U.S. at 679. The complaint does not explain, for example, whether the alleged COVID-positive prisoners had tested positive at the time when placements were made or whether substantial time had passed since the prisoners had tested positive. In short, Plaintiffs have alleged facts suggesting only the mere possibility that Defendant Macauley violated the Eighth Amendment. Plaintiffs' allegations therefore fail to state a claim. *See Iqbal*, 556 U.S. at 678.

Moreover, the complaint does not explain Defendant Macauley's suggested personal involvement, as the warden of the prison, in the cell placements of any particular prisoner. Even if

the Court were to assume that Defendant Macauley personally decided or approved of cell placements, Plaintiffs have not shown that Defendant Macauley knew any prisoner's COVID-19 status to indicate that Macauley knew of a risk to any Plaintiff's health or safety. Plaintiffs therefore fail to state an Eighth Amendment claim against Defendant Macauley for a second reason. *See Farmer*, 511 U.S. at 837.

### (5)   Officer Stuntman's visits

Plaintiffs contend that Defendant Stuntman twice visited Unit 5 in December 2021 in violation of the Eighth Amendment. Other than Stuntman passing out Christmas gifts to all of the Unit 5 Plaintiffs, the complaint alleges only that Stuntman "was positive of COVID-19" when he passed out the gifts (Compl., ECF No. 1, PageID.5), that Stuntman returned to the unit the following Monday, and that Stuntman purportedly "was reminded that he was positive of COVID-19" when he returned (*id.*, PageID.5, 11).

Plaintiffs have offered stunningly little information about Defendant Stuntman's purported illness. They fail to indicate whether Stuntman ever tested positive for COVID-19, when he learned that he tested positive for COVID-19, when and if he tested negative before returning to work, whether he was ever symptomatic, whether he visited the entire unit when he returned to work or only the COVID-positive area, which Plaintiffs he came into close contact with and whether they were sick at the time, where he went within Unit 5, how long he spent on Unit 5 while purportedly positive, or the answers to myriad other questions that could provide context to their claim. In short, Plaintiffs apparently seek to exploit the ambiguity created by the absence of allegations to fabricate plausibility of their claim. But ambiguity does not support a claim, factual allegations do.

Unfortunately for Plaintiffs, the complaint's factual allegations are simply too scarce. Plaintiffs must plead enough factual content to permit the Court to draw a reasonable inference

that Defendant Stuntman violated the Eighth Amendment. *See Iqbal*, 556 U.S. at 679. Plaintiffs

have not done so here. Therefore, the Court must dismiss their Eighth Amendment claim against

Defendant Stuntman.

### B.      Fourteenth Amendment Equal Protection Clause

Plaintiffs assert that Defendant Macauley discriminated against them because he

purportedly permitted other COVID-negative prisoners to access the IBC 300 building, which

includes the "law library, chapel, school, barber, psych service[s] and other program building

services," but Macauley did not provide the same access to the prisoners isolating on Unit 5.

(Compl., ECF No. 1, PageID.11–12.) Although Plaintiffs refer to "due process," their allegations

of discrimination appear to raise an Equal Protection Clause claim.[24]

The Equal Protection Clause prohibits discrimination by government actors which either

burdens a fundamental right, targets a suspect class, or intentionally treats one differently than

others similarly situated without any rational basis for the difference. *Rondigo, L.L.C. v. Twp. of

Richmond*, 641 F.3d 673, 681–82 (6th Cir. 2011); *Radvansky v. City of Olmsted Falls*, 395 F.3d

291, 312 (6th Cir. 2005). A state practice generally will not require strict scrutiny unless it

interferes with a fundamental right or discriminates against a suspect class of individuals. *Mass.

Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976).

---

[24] To the extent Plaintiffs intend to raise a separate substantive due process claim, their claim again
fails because it is properly brought as an Equal Protection Clause claim. *See Albright v. Oliver*,
510 U.S. 266, 269 (1994) ("Where a particular [a]mendment 'provides an explicit textual source
of constitutional protection' against a particular sort of government behavior, 'that [a]mendment,
not the more generalized notion of "substantive due process," must be the guide for analyzing
these claims.'" (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989))).

Plaintiffs' allegations neither implicate a fundamental right nor state that they are members of a suspect class. Plaintiffs instead appear to contend that they have been treated differently from others similarly situated without any rational basis for the difference.

To prove an equal protection claim in a class-of-one case, Plaintiffs must demonstrate "intentional and arbitrary discrimination" by the state; that is, they must demonstrate that they "ha[ve] been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Nordlinger v. Hahn*, 505 U.S. 1, 10–11 (1992); *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011). A plaintiff "must overcome a 'heavy burden' to prevail based on the class-of-one theory." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462 (6th Cir. 2012) (citing *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty.*, 430 F.3d 783, 791 (6th Cir. 2005)). "Unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors." *Loesel*, 692 F.3d at 462 (quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1210–11 (10th Cir. 2004)).

The threshold element of an equal protection claim is disparate treatment. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006); *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. Of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006))). "'Similarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'" *Paterek v. Vill. of Armada*, 801

F.3d 630, 650 (6th Cir. 2015) (quoting *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011));

*see also Nordlinger*, 505 U.S. at 10; *Tree of Life Christian Sch. v. City of Upper Arlington*, 905

F.3d 357, 368 (6th Cir. 2018) ("A plaintiff bringing an equal protection claim must be 'similarly

situated' to a comparator in 'all relevant respects.'").

 Plaintiffs have failed to allege any facts to demonstrate that comparators were similar in all

relevant respects. Plaintiffs offer only a conclusory statement that "other prisoners" were

"sim[i]larly situated," (Compl., ECF No. 1, PageID.12), to support the contention that they were

similar in all relevant aspects to any prisoners treated differently. But Plaintiffs' conclusory

allegation does not suffice. *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept a

complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements,

supported by mere conclusory statements.").

 Instead, Plaintiffs' equal protection claim is undermined by their own allegations. Plaintiffs

allege that they were in a prison unit that experienced a COVID-19 outbreak in December 2021.

In the context of their inability to move about the prison facility, their recent exposure to a

transmissible disease was clearly a relevant characteristic. Yet, Plaintiffs do not allege that any

putative comparators were likewise exposed to COVID-19. Without such an allegation, they fail

to allege that any putative comparator is "similar in 'all relevant respects.'" *See Paterek*, 801 F.3d

at 650. Consequently, Plaintiffs' have not identified any others who are "similarly situated."

 Because Plaintiffs have not alleged that Defendants treated them disparately as compared

to others similarly situated, they cannot maintain an equal protection claim. *See Ctr. for Bio-*

*Ethical Reform, Inc.*, 648 F.3d at 379. Accordingly, the Court will dismiss their equal protection

claim.

### C.       First Amendment Free Exercise

Plaintiffs contend that Defendant Macauley violated their First Amendment rights when he allegedly precluded Unit 5 prisoners from the IBC 300 building.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend I. The right to freely exercise one's religion falls within the fundamental concept of liberty under the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). Accordingly, state legislatures and those acting on behalf of a state are "as incompetent as Congress" to interfere with the right. *Id.*

While "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates clearly retain the First Amendment protection to freely exercise their religion. *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). To establish that this right has been violated, a plaintiff must establish (1) that the belief or practice he seeks to protect is religious within his own "scheme of things," (2) that his belief is sincerely held, and (3) that the defendant's behavior infringes upon this practice or belief. *Kent v. Johnson*, 821 F.2d 1220, 1224–25 (6th Cir. 1987); *see also Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (same).

Plaintiffs fail to allege facts necessary to satisfy their initial burden. To be sure, Plaintiffs allege that, while isolating or quarantining, they lacked access to the IBC 300 building. They also allege that the IBC 300 building houses a chapel among other services. Yet, conspicuously absent from the complaint is an allegation that any Plaintiff intended to engage in a practice or belief that could be interpreted as religious, much less that Defendant Macauley infringed on that practice or belief. Consequently, Plaintiffs fail to plead enough factual content to permit the Court to draw a reasonable inference that Defendant Macauley violated their First Amendment rights. *See Iqbal*,

556 U.S. at 679. Therefore, the Court must dismiss their First Amendment claim against Defendant Macauley.

### D. Access to the Courts

Plaintiffs also contend that Defendants Lemke and Ritter failed to process legal mail for prisoners isolating on Unit 5. Plaintiffs argue that their rights to access the courts have been infringed in violation of the First and Fourteenth Amendments. Although the complaint is not clear, Plaintiffs presumably intend to further argue that in closing access to the IBC 300 building, Defendant Macauley also impeded their access to the courts.

It is well established that prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977). The principal issue in *Bounds* was whether the states must protect the right of access to the courts by providing law libraries or alternative sources of legal information for prisoners. *Id.* at 817. The Court further noted that in addition to law libraries or alternative sources of legal knowledge, the states must provide indigent inmates with "paper and pen to draft legal documents, notarial services to authenticate them, and with stamps to mail them." *Id.* at 824–25. The right of access to the courts also prohibits prison officials from erecting barriers that may impede the inmate's access to the courts. *See Knop v. Johnson*, 977 F.2d 996, 1009 (6th Cir. 1992).

An indigent prisoner's constitutional right to legal resources and materials is not, however, without limit. In order to state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury." *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop*, 977 F.2d at 1000. In other words, a plaintiff must plead and demonstrate that the shortcomings in the prison legal assistance program or lack of legal materials have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim. *Lewis*, 518 U.S. at 351–53; *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir.

1996). The Supreme Court has strictly limited the types of cases for which there may be an actual injury:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis*, 518 U.S. at 355. "Thus, a prisoner's right to access the courts extends to direct appeals, habeas corpus applications, and civil rights claims only." *Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999) (en banc). Moreover, the underlying action must have asserted a non-frivolous claim. *Lewis*, 518 U.S. at 353; *accord Hadix v. Johnson*, 182 F.3d 400, 405 (6th Cir. 1999) (discussing that *Lewis* changed actual injury to include requirement that action be non-frivolous).

In addition, the Supreme Court squarely has held that "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citing *Lewis*, 518 U.S. at 353 & n.3). "Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Id.* at 415.

Plaintiffs utterly fail to demonstrate that anyone suffered an actual injury as defined by *Lewis* and *Thaddeus-X*. Consequently, *Christopher* instructs that their claims must be dismissed. *See* 536 U.S. at 415 ("[T]he underlying cause of action . . . is an element that must be described in the complaint . . . ."). The Court will therefore dismiss their access-to-the-courts claims.[25]

---

[25] As noted in Part III, this is not Plaintiff Sanders' first attempt to bring a claim in the Western District of Michigan that prison officials infringed on his access to the courts. Indeed, Sanders previously challenged Defendant Macauley's roles in closing the IBC law library in the fall of 2020 during the COVID-19 pandemic. *See Sanders v. Washington*, No. 1:21-cv-54, 2021 WL

### E.  Supervisory Liability

To the extent that Plaintiffs' allegations assert that Defendant Macauley "fail[ed] to enforce the posted rules/requirements of the staff wearing P.P.E." (Compl., ECF No. 1, PageID.10), or assert any residual claims against Defendant Macauley, those allegations appear rooted in their belief that Macauley failed to properly supervise his subordinates. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. As fully discussed above, Plaintiffs have failed to allege

---

1049876, at *3–4 (W.D. Mich. Mar. 19, 2021). In that action, Sanders suggested that Defendant Macauley and another defendant impaired his ability to seek judicial review of a prison misconduct conviction. That court dismissed the claim because "a petition for judicial review of a misconduct conviction is not an attack on the prisoner's conviction or sentence; nor is it a challenge to the conditions of confinement." *Id.* at *4. Importantly, the opinion explained (1) that a plaintiff must address in his allegations the underlying cause of action and the remedy lost by a defendant's conduct and (2) what qualifies as an "actual injury" for an access-to-the-courts claim. In the instant complaint, Sanders completely ignores the guidance previously given by the court.

that Defendant Macauley engaged in any active unconstitutional behavior. Accordingly, Plaintiffs fail to state a claim against him.

### Conclusion

The Court will deny Plaintiff Sanders' pending motions. Further, having conducted the review required by the Prison Litigation Reform Act, the complaint as to Plaintiff Sanders will be dismissed as malicious pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court also determines that, as to the remaining Plaintiffs, the complaint will be dismissed pursuant to 28 U.S.C. § 1915A(b) and 42 U.S.C. § 1997e(c), because it fails to state a claim. The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). Although the Court concludes that Plaintiffs' complaint is properly dismissed, the Court declines to conclude that any issue Plaintiffs might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith.

This is a dismissal as described by 28 U.S.C. § 1915(g).

An order and a judgment consistent with this opinion will be entered.

Dated:   April 21, 2022                              /s/ Paul L. Maloney
                                                                  Paul L. Maloney
                                                                  United States District Judge